UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**CHARLES E. HORNE**

       **Plaintiff,**         **CIVIL ACTION NO. 05-CV-71901-DT**

     **vs.**        **DISTRICT JUDGE ARTHUR J. TARNOW**

**COMMISSIONER OF**        **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

       **Defendant.**
_____/

**I.   REPORT AND RECOMMENDATION**

This Court recommends that Defendant's Motion for Summary Judgment (Docket # 11) be **DENIED** and the matter **REMANDED** to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**II.  PROCEDURAL HISTORY**

This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382.  The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Charles E. Horne filed an application for Supplemental Security Income (SSI) on February 26, 2002 alleging he had been disabled since August 1, 2002.  (Tr. 45-47, 364-65).  Plaintiff's claim was initially denied on August 26, 2002.  (Tr. 30-35).  Plaintiff sought a review hearing before an Administrative Law Judge (ALJ) on October 21, 2002. (Tr. 36-37).  A hearing took place before ALJ John A. Ransom on June 1, 2004.  (Tr. 373-395).  Plaintiff was represented by an attorney at the hearing.  (Tr. 375).  The ALJ denied

Plaintiff's claim in an opinion issued on January 3, 2005. (Tr. 11-24). The Appeals Council denied review of the ALJ's decision on March 30, 2005 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 6-10); 20 C.F.R. § 404.981. Plaintiff appealed the denial of his claims to this Court, and the parties have filed motions for summary judgment.

### III.  MEDICAL HISTORY

Plaintiff has diabetes mellitus with neuropathy and retinopathy, a status post diabetic foot ulcer, bilateral cataracts and chronic obstructive pulmonary disease. (Tr. 15-16). He also had a history of emergency room treatment related to his diabetes. (Tr. 96-174).

In December 2001 Plaintiff was hospitalized due to complications with his diabetes. (Tr. 138-69). Plaintiff's case worker recommended that Plaintiff undergo a psychiatric examination. (Tr. 175). On April 26, 2002 Dr. Gerard R. Williams, Ph.D., evaluated Plaintiff. (Tr. 175-80). During the evaluation, Plaintiff admitted to a history of polysubstance abuse and that he last used cocaine six weeks earlier. Plaintiff also stated that he drinks about 60 ounces of beer a day. (Tr. 176). Plaintiff told Dr. Williams that he: (1) does not require any assistance with regard to his daily living activities; (2) has no visual or auditory hallucinations; (3) left school because he was "tired of it" and did not attend any special education classes while in school. (Tr. 176-78). Dr. Williams observed that Plaintiff was alert, oriented, friendly, and cooperative during the evaluation. Plaintiff did not display any confusion regarding the testing process and he put forth the maximum effort. (Tr. 178). Dr. Williams also noted that fatigue, anxiety, emotionality, pain or the effects of medication did not compromise the testing process. Dr. Williams further commented that Plaintiff's expressive and receptive speech was slow but that he had normal thought processes. *Id.*

Dr. Williams administered various tests to Plaintiff during the evaluation. The results of the Wechsler Adult Intelligence Scale-Revised ("WAIS-R") test performed by Dr. Williams showed a verbal IQ of 65; a performance IQ of 59; and a full scale IQ of 59, which placed Plaintiff in the intellectually deficient range. (Tr. 178).

The results of the Personality Assessment Inventory test conducted by Dr. Williams yielded invalid results due to Plaintiff's inconsistent and infrequent response patterns and negative impression. (Tr. 179). Dr. Williams noted that Plaintiff's losses in cognitive function impaired his abilities to perform on this test. *Id.*

Dr. Williams concluded that Plaintiff's only cognitive strength is in immediate numerical recall, that Plaintiff operates in the intellectually deficient range, and that Plaintiff has severe losses in his cognitive efficiency. (Tr. 180). Dr. Williams ultimately diagnosed Plaintiff with a cognitive disorder not otherwise specified ("NOS"), a mood disorder secondary to his medical condition, and polysubstance abuse. *Id.*

Lastly, Dr. Williams assessed Plaintiff's residual mental functioning and found: (1) no significant limitations in Plaintiff's ability to either remember locations and work-like procedures or to respond appropriately and to ask simple questions or request assistance; (2) moderate limitations in many of Plaintiff's abilities, including his ability to understand, remember and carry out one or two step instructions; and (3) marked limitations in Plaintiff's abilities to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, maintain pace of normal work day without an unreasonable number of lengthy rest periods, and to set realistic goals or independent plans. (Tr. 185-86).

Dr. Matthew P. Dickson, Ph.D. performed a psychological evaluation of Plaintiff three months later at the agency's request. (Tr. 193-99). Plaintiff told Dr. Dickson that: (1) he did okay in school, which had not been particularly hard; (2) he stopped using drugs many years ago but drank beer moderately; (3) he sometimes hears voices; (4) he seldom feels happy; (5) he feels alone since his mother died but denied any difficulties in getting along with others; and (6) he is tired all of the time. (Tr. 193-95). Plaintiff further told Dr. Dickson that he is able to buy and cook his own food, do household chores, keep his own appointments. (Tr. 194). Plaintiff also took a taxi to Dr. Dickson's office for his appointment and he arrived alone and on time. (Tr. 194).

Dr. Dickson reported that Plaintiff was in contact with reality but appeared extremely tired during the evaluation and even appeared to have fallen asleep on occasion. Plaintiff's speech was slow and quiet but his thoughts were coherent and organized. Dr. Dickson noted that Plaintiff tended to exaggerate his symptoms and had a low motivational level. (Tr. 194). Dr. Dickson administered several tests but noted that Plaintiff did not exert much effort in taking them; instead he made jokes and rhymes. (Tr. 197). On the WAIS III test, Plaintiff scored a verbal IQ of 73 (borderline range) and a performance and full scale IQ of 67 (extremely low range). *Id.* On the Wide Range Achievement Test ("WRAT-3") Plaintiff's reading score put him at the 8th grade level (low average range) and his math score was at the 3rd grade level (deficient range). (Tr. 198).

Dr. Dickson concluded that Plaintiff's IQ and test scores underestimated Plaintiff's abilities due to inconsistent effort and extreme fatigue and he estimated that his range was likely borderline. (Tr. 199). The doctor also noted that drug use would provide an alternate explanation for Plaintiff's difficulties although Plaintiff denied such usage. Dr. Dickson also

-4-

expressed doubt regarding the veracity of Plaintiff's statement that he hears voices.  Dr. Dickson ultimately diagnosed Plaintiff with depressive disorder NOS, psychotic disorder NOS (provisionally) and borderline intellectual functioning (provisionally).  (Tr. 195).

On August 13, 2002 a state agency psychiatrist and physician, Dr. Sydney Joseph, reviewed Plaintiff's records and completed a Psychiatric Review Technique form ("PRTF") and a mental Residual Functional Capacity Assessment form ("RFCA").  (Tr. 220-38).  Dr. Joseph diagnosed Plaintiff with questionable schizophrenia (Listing 12.03), affective disorder (Listing 12.04) and mental retardation (Listing 12.05).  Dr. Joseph then determined that Plaintiff had mild limitations in most is areas of mental functioning but was moderately limited in his ability to maintain attention and concentration for extended periods.  Dr. Joseph also concluded that Plaintiff could perform simple, unskilled work despite his limitations.

## IV.     HEARING TESTIMONY

### A.     Plaintiff's Testimony

Plaintiff was forty-eight years old and had a 10th grade education.  (Tr. 377, 391).  Plaintiff testified about his prior employment as a maintenance worker.  (Tr. 378-80).  He also told the ALJ that he only took drugs once and stopped taking them in 2000 but that he drank beer up until March 10, 2004.  (Tr. 383-84).  Plaintiff also stated that he has: (1) depression for which he takes Prozac; (2) difficulty sleeping and needs to lay down during the day because he is tired; and (3) problems with concentration and he cannot remember what he is supposed to do.  (Tr. 386-87).

### B.     Vocational Expert's Testimony

Timothy Shaner, a vocational expert ("VE"), also testified at the administrative hearing in response to hypothetical questions posed by the ALJ.  (Tr. 390-395).  The ALJ asked the VE to testify as to what jobs would be available for an individual of Plaintiff's age, education and work history and who is also limited to sedentary work with a sit/stand option that did not involve: (1) squatting, kneeling, crawling or climbing; (2) repetitive gripping or grasping; (3) fine dexterity or visual acuity; (4) work in unprotected heights or around moving machinery; and (5) more than simple, repetitive jobs with simple, repetitive verbal instructions.  (Tr. 391).  The VE testified that there are a significant number of unskilled sedentary jobs available in the regional economy that could be performed by an individual with these limitations.  (Tr. 392).

Plaintiff's attorney then questioned the VE as follows: "[i]f a hypothetical Claimant had the ability to maintain attention, concentration for extended periods . . . if they're markedly limited in that ability, . . . they could still perform this kind of work you've listed?" (Tr. 393).  The attorney then defined "markedly limited" as "could not usefully perform or sustain the activity maintaining concentration for extended periods."  (Tr. 393).

The VE responded:

> Well, let me answer you this way, Mr. Seward, these positions, as most unskilled positions, a typical expectation would be at least 75 percent of a given day, an individual would be on-task and would be paying attention to what they're doing.  These jobs don't require any one task that would require extended periods, but you know, as opposed to many tasks during the day – that would require short amounts of time.  But the entire day, one should be on task a least 75 percent of the time.  (Tr. 393-94).

-6-

**V.      The ALJ's FINDINGS**

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since August 1, 2002.  (Tr. 23).  He further found that Plaintiff's impairments were not listed or medically equal to a listed impairment.  *Id.*  The ALJ also surmised that Plaintiff could not perform his past relevant work but that he retained the residual functioning capacity ("RFC") to perform a limited range of unskilled sedentary work with restrictions of a sit/stand option, no crawling, squatting, kneeling or climbing, no repetitive gripping or grasping, no fine dexterity or visual acuity, no unprotected heights or working around moving machinery, and simple and repetitive job tasks involving simple verbal instructions.  *Id.*  Plaintiff's claim was denied because the ALJ determined that there were a significant number of jobs available in the economy for a person of Plaintiff's age, educational, work history and RFC.  *Id.*  Furthermore, the ALJ determined that Plaintiff's testimony was not fully credible.  *Id.*

**VII.     LAW AND ANALYSIS**

Plaintiff raises three challenges to the ALJ's findings regarding Plaintiff's mental limitations: (1) substantial evidence does not support the ALJ's step three determination that Plaintiff's mental condition did not met or equal Listing 12.05(B) for mental retardation; (2) substantial evidence does not support the ALJ's RFC assessment that Plaintiff can perform simple repetitive jobs with simple repetitive instructions; and (3) the ALJ's posed an improper hypothetical to the VE based on the faulty RFC and therefore substantial evidence does not support the ALJ's finding that  there were a significant number of jobs available in the economy for a person of Plaintiff's age, education, work history, and RFC.

### A. STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B. REGULATORY FRAMEWORK

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

  (1) he was not presently engaged in substantial gainful employment; and

  (2) he suffered from a severe impairment; and

>   (3)   the impairment met or was medically equal to a "listed impairment;" or
>
>   (4)   he did not have the residual functional capacity (RFC) to perform his relevant past work.

See 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.

### C.   Listing 12.05 – Mental Retardation

Plaintiff claims that the ALJ erred at step three by not finding him disabled due to mental retardation pursuant to Listing 12.05(B). To prove a disability for mental retardation, a claimant must show "a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22) . . . ." 20 C.F.R. Pt. 404, Supt. P, App. 1 § 12.05. Additionally, the record must contain evidence of "[a] valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. Pt. 404, Supt. P, App. 1 § 12.05(B).

Section 12.05 requires a *valid* IQ score. The ALJ "is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record." *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998). Indeed, the ALJ should examine test results of this sort to assure consistency with daily activities and behavior. *Id.* "The IQ score must reflect the claimant's true abilities as demonstrated by his or her performance at work, household management and social functioning. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1,

§ 12.00B-C." *Brown v. Sec'y of Health & Human Srvs.*, 948 F.2d 268, 270 (6th Cir. 1991). The regulations advise that "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test should comment on whether the IQ scores are considered valid and consistent with the [claimant's] developmental history and the degree of functional limitations." 20 C.F.R. Pt. 404, Supt. P, App. 1, § 12.00(D)(6)(a).

Dr. Williams found that Plaintiff had a performance and full scale IQ score of 59 while Dr. Dickson determined that Plaintiff had performance and full scale IQ score of 67. Plaintiff contends that the ALJ improperly discounted Plaintiff's IQ scores as found by Dr. Williams. Plaintiff does not object to the ALJ's finding that Plaintiff's IQ scores as reported by Dr. Dickson were invalid.[1]

The ALJ discussed Dr. Williams' and Dr. Dickson's reports and findings in his written opinion. (Tr. 18-20). The ALJ clearly found that Plaintiff's IQ scores as reported by Dr. Dickson were invalid based upon the doctor's opinion that the scores were a likely underestimation of Plaintiff's actual intellectual ability due to fatigue and inconsistent effort. (Tr. 19). A liberal reading of the ALJ's opinion suggests that to the extent he actually rejected Dr. Williams' tests results, he did so based upon Dr. Dickson's opinion that the results were compromised by fatigue, inconsistent effort and possibly substance abuse. However, Dr. Dickson's conclusions do not provide an adequate basis for the ALJ to reject Dr. Williams' scores. Specifically, the ALJ did not explain how Dr. Dickson's conclusions

---

[1] Plaintiff initially argued that ALJ's failure to consider that Plaintiff's IQ scores as found by Dr. Dickson's test had increased due to a concept known as the "practice effect." (Pl.'s Mot. for Summ. J. pp. 6-8). Plaintiff later withdrew this argument. (Pl.'s Am. Reply Br. at 5).

undermined Dr. Williams' explicit findings that fatigue and lack of effort did not affect his test results.

Defendant points to several facts that the ALJ could have relied upon to support his rejection of Dr. Williams' test results because Dr. Williams did not comment on whether he considered Plaintiff's IQ scores to be valid. For example, Defendant contends that Dr. Williams' statement that Plaintiff's personality assessment was invalid might infer that Plaintiff's IQ scores as found by Dr. Williams were likewise invalid. Defendant also suggests that Plaintiff's misrepresentation to Dr. Williams regarding his prior drug use undermines the validity of Plaintiff's IQ scores, as does Plaintiff's tendency to exaggerate his symptoms as found by Dr. Dickson. Lastly, Defendant notes that because the IQ test results as found by Dr. Williams and Dr. Dickson were inconsistent, the credibility of Dr. Williams' test results is questionable. However, it is the duty of the ALJ in the first instance to examine such facts and to draw any reasonable conclusions from them to support his or her stated findings so that this Court may conduct a meaningful review. *See Ivy v. Sec'y of Health & Human Servs.*, 976 F.2d 288, 289 (6th Cir.1992) (a reviewing court "should not be left to guess as to the . . . reasons for granting or denying relief."). The Court concludes that the ALJ's finding is not supported by substantial evidence. Therefore, the matter must be remanded to the Commissioner so that she may explain her rejection of Plaintiff's IQ scores as found by Dr. Williams.[2]

---

[2]     Plaintiff would also have to prove that his mental impairment results in "deficits in adaptive behavior initially manifested" prior to the age of 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The ALJ made no findings regarding these issues.

The Commissioner may also consider additional evidence such as the opinion of Dr. Williams or another qualified doctor as to the validity of Plaintiff's IQ scores.

**D.     Adequacy of the ALJ's Finding**

Plaintiff contends that the ALJ's RFC finding at step four that Plaintiff can perform "simple and repetitive job tasks involving simple verbal instructions" did not adequately reflect the ALJ's step three finding that Plaintiff is markedly limited in his ability to maintain concentration, persistence or pace.

A finding of disability due to a mental disorder requires medical documentation of a medically determinable impairment and a consideration of the degree of limitation that such impairment impose upon the claimant's ability to work.  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A).  Specifically, a claimant must show: (1) a psychological impairment found in the Listing of Impairments (Paragraph A criteria); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A); and (2) said impairment causes functional limitations in four broad categories, including daily living activities, social functioning, concentration, persistence or pace, and episodes of decompensation in work or work-like settings that are inconsistent with the ability to engage in substantial, gainful activity (Paragraph B criteria); *Id.* at 12.00(B).  The limitations identified in an assessment of the Paragraph B criteria do not equal an RFC assessment.  Rather, the ALJ must determine a claimant's RFC based upon a more detailed analysis of various itemized functions within the four broad categories identified in Paragraph B.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A); S.S.R. 96-8p (1996).

The ALJ found at steps two and three that Plaintiff had depressive, cognitive, mood and polysubstance addiction disorders which resulted in "marked" difficulties maintaining

---

Furthermore, the Commissioner could order the re-administration of another IQ test. *See Brown*, 948 F.2d at 270.

concentration, persistence or pace.[3]  The ALJ further found that Plaintiff's disorders resulted in only mild restrictions of Plaintiff's daily activities and difficulties maintaining social functioning and that Plaintiff had no episodes of decompensation.  (Tr. 20).  However, the ALJ concluded at step four that Plaintiff has the RFC to perform simple and repetitive job tasks with simple, verbal instructions despite his limitations.  *Id.*

The Court agrees with the general assertion that certain facts could justify an ALJ's RFC finding that a claimant can perform simple, repetitive job tasks with simple, verbal instructions despite a step three finding that said claimant is markedly limited in concentration, persistence or pace.  *See, e.g., Smith v. Halter*, 307 F.3d 377 (6th Cir. 2001).  Unfortunately, the ALJ did not cite to any of the facts he used to support such a finding in this case.[4]  Consequently, the Court cannot assess whether relevant evidence adequately supports the ALJ's conclusion.  Since the matter must be remanded, the record should be more fully developed as to this issue.

### E. Adequacy of the ALJ's Hypothetical to the VE

Plaintiff also asserts that ALJ posed an improper hypothetical to the VE based on the faulty RFC and therefore substantial evidence does not support the ALJ's finding

---

[3] "Marked" is defined as "more than moderate but less than extreme . . . [which] may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitations is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00(C).

[4] Defendant asserts that the ALJ's RFC was reasonably based on the record and cites to the conclusions of Dr. Sydney who opined that Plaintiff could perform unskilled involving no more than simple and repetitive job tasks with simple, verbal instructions.  However, the ALJ stated that he rejected the opinions of the state agency physicians, including their RFC assessments, as inconsistent with the record. (Tr. 21).

that there were a significant number of jobs available in the economy for a person of Plaintiff's age, education, work history, and RFC. Because this Court recommends that the case be remanded for further analysis under steps three and four, it is unnecessary to address this remaining issue.

## RECOMMENDATION

The Court recommends that Defendant's Motion for Summary Judgment be **DENIED.**

The Court also recommends that this case be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g) for the Commissioner to: (1) address the validity of Plaintiff's IQ scores as found by Dr. Williams, and, if necessary, determine whether Plaintiff is otherwise disabled under Listing 12.05; (2) re-evaluate Plaintiff's mental RFC to perform unskilled, simple repetitive job tasks with simple, verbal instructions in light of his "marked" limitations in concentration, persistence and pace; and (3) conduct a new step five analysis if otherwise appropriate.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to

Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: August 23, 2006              s/ Mona K. Majzoub
                                    **MONA K. MAJZOUB**
                                    **UNITED STATES MAGISTRATE JUDGE**



### Proof of Service

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.


Dated: August 23, 2006              s/ Lisa C. Bartlett
                                    Courtroom Deputy